UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JOSEPH ANTHONY MCDANIELS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:18-cv-00238-JPH-MJD |
| | ) | |
| SMITH, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

After two to three days without his prescription medications, Joseph
McDaniels, an inmate at FCC Terre Haute, collapsed in his cell and was taken
by ambulance to an emergency room at a local hospital. The medical staff at the
hospital resumed Mr. McDaniels' cardiac medications, and his condition
improved to baseline within a couple days.

Mr. McDaniels alleges that defendants Lt. Baker and Nurse Smith acted
with deliberate indifference to his serious medical need by failing to provide him
with his cardiac medications. Specifically, Mr. McDaniels argues that Lt. Baker
refused to let him take his self-carry cardiac medications with him to the Special
Housing Unit, causing a lapse in medication. And when he brought the issue to
Nurse Smith's attention later that day, she allegedly failed to make efforts to
retrieve his cardiac medications or order additional doses of his cardiac
medications from the pharmacy.

Mr. McDaniels also brings a negligence claim against the United States
under the Federal Tort Claims Act on the theory that one or more correctional

officers disabled the duress alarm in his cell, which prevented him from calling for help before his collapse.

The defendants have moved for summary judgment. For the reasons that follow, the defendants' motion for summary judgment is **GRANTED in favor of Lt. Baker and DENIED as to Nurse Smith and the United States.**

## I.
## SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that the movant is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(a). A party must support any asserted disputed or undisputed fact by citing to specific portions of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party may also support a fact by showing that the materials cited by an adverse party do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the only disputed facts that matter are material ones—those that might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016).

2

"A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609−10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Indiana University*, 870 F.3d 562, 573−74 (7th Cir. 2017) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3).

## II.
## FACTUAL BACKGROUND

### A. Joseph McDaniels

In August 2017, Mr. McDaniels was a convicted federal prisoner at the Federal Correctional Complex in Terre Haute, Indiana ("FCC-TH"). Dkt. 79-1, p. 62; dkt. 82-1, p. 2, para. 4. He was 48 years old and suffering from several chronic medical conditions, including atrial fibrillation, cardiomyopathy, mixed hyperlipidemia, congestive heart failure, obstructive sleep apnea, morbid obesity, gastroesophageal reflux disease ("GERD"), neuropathy, and insulin

dependent diabetes mellitus. Dkt. 79-1, p. 2, para. 5; dkt. 79-3, p. 2.; dkt. 79-17; dkt. 79-20; dkt. 82-1, p. 22.

Mr. McDaniels was taking multiple prescription medications to treat these conditions:

- NPH insulin and regular insulin for diabetes;

- venlafaxine and capsaicin cream for neuropathy;

- omeprazole for GERD;

- vitamin D ointment for his skin;

- diltiazem and digoxin to control his heart rate and manage atrial fibrillation;

- metoprolol, atorvastatin, and hydrochlorothiazide to treat high blood pressure, control his heart rate, and manage fluid retention;

- warfarin (Coumadin) to prevent blood clots, heart attack, and stroke; and

- a CPAP machine to treat obstructive sleep apnea and reduce his risk of sudden cardiac death or stroke.

*See* dkt. 79-1, pp. 41-46; dkt. 79-2; dkt. 79-17, p. 2; dkt. 79-20, p. 3; dkt. 82, pp. 2-3, para. 5.

Mr. McDaniels received insulin and venlafaxine from nursing staff in his cell. Dkt. 79-1, p. 42; dkt. 79-9. This is referred to as "pill line." *Id.*

Mr. McDaniels "self-carried" all other medications. Dkt. 79-2, p. 2. For self-carried medications, the inmate is given an allotment of medication, usually for

about 2 weeks or 30 days, and is responsible for self-administering that medication at the appropriate times. Dkt. 79-1, p. 43.

When Mr. McDaniels receives his cardiac medications, his resting heart rate is generally between 60 to 100 beats per minute. Dkt. 79-1, p. 45. Without these medications, his resting heart rate may elevate to 170 to 180 beats per minute. *Id.*

### B. Defendants

At all times relevant to the events described in the Complaint:

Jamie Baker was employed as a Lieutenant with the Special Investigative Services for FCC-TH. Dkt. 79-5. His job duties included investigating inmate misconduct, responding to security threats, and other activities relating to law enforcement within FCC-TH. *Id.*

Michele Smith was employed as a registered nurse in the Special Housing Unit ("SHU") at FCC-TH. Dkt. 79-7.

### C. Mr. McDaniels Is Transferred to the SHU During A Drug Trafficking Investigation

FCC-TH consists of FCI Terre Haute, a medium-security prison, and USP Terre Haute, a maximum-security prison. Dkt. 79-1, p. 10. The SHU is a segregation unit where inmates are kept in isolated cells for close to 24 hours per day. Dkt. 82-1, p. 4, n. 4.

On August 3, 2017, Lt. Baker intercepted a letter addressed to Mr. McDaniels' son regarding an attempt to smuggle drugs into FCC-TH. Exh. 79-5. As part of his investigation, Lt. Baker took Mr. McDaniels that same day from his cell at FCI Terre Haute to a holding cell for questioning, and then

escorted him to a transport van to be moved to the SHU. Dkt. 79-1, pp. 24-25; dkt. 79-5, paras. 7, 8; 82, p. 3, para. 11. Mr. McDaniels told Lt. Baker that he had not had breakfast, was diabetic, and needed his medications. Dkt. 79-1, pp. 24-25, 104; dkt. 82, p. 3, paras. 12-13. Lt. Baker told Mr. McDaniels, "They will get you whatever you need [at the SHU]," and put him on a transport van headed to the SHU. Dkt. 79-1, p. 26; dkt. 82-1 at p. 3, para. 14. Lt. Baker had no further contact with Mr. McDaniels until after he was hospitalized. Dkt. 79-1 at 26.

### D. Mr. McDaniels' Medical Treatment in the SHU

Mr. McDaniels did not receive any medical care related to his cardiac conditions from the time he was transported to the SHU until his collapse and emergency hospitalization two days later. Dkt. 79-9; dkt. 82-1, p. 4, para. 22.

Nurse Smith was a registered nurse working in the SHU. Dkt. 79-7, para. 4. She, along with other medical staff in the SHU, was notified that Mr. McDaniels was being transferred to the SHU and was classified as "Care 3 Medical." *Id.* at para. 5; dkt. 79-8. This care classification informed Nurse Smith that Mr. McDaniels "had been identified as having complex or chronic health conditions that require frequent clinical contacts to maintain stability and prevent medical complications." *Id.* She understood the purpose of this notification was "to notify medical staff about Mr. McDaniels' impending arrival at the SHU, so that medical staff could provide him with medical care while he was in this unit." *Id.*

On Mr. McDaniels' first evening in the SHU, Nurse Smith went to his cell and administered his insulin injections. Dkt. 82-1, p. 4, paras. 17-19; dkt. 79-9. In the SHU, medical staff periodically come around to dispense medication to inmates. In doing so, medical personnel stop and watch the inmate while he takes his medication. Dkt. 79-1, p. 31. Nurse Smith was the first medical staff member Mr. McDaniels interacted with following his transfer. Dkt. 82-1, p. 4, para. 17. During their visit, Mr. McDaniels "specifically asked [Nurse Smith] about [his] heart medications and about [his] CPAP machine."[1] Dkt. 79-1, p. 29. Nurse Smith told Mr. McDaniels, "[S]top whining . . . we don't do that over here." *Id.*

Immediately following this visit, Nurse Smith sent an email to other SHU medical staff to notify them that Mr. McDaniels needed to receive his evening dose of venlafaxine from the pill line. Dkt. 79-7, para. 8; dkt. 79-10, p. 2. She sent a second email to other BOP personnel inquiring about the location of Mr. McDaniels' CPAP machine. Dkt. 79-7, para. 9; dkt. 79-11, p. 2.

At approximately 7:00 a.m. the following morning, August 4, 2017, Mr. McDaniels received his regular insulin injection. Dkt. 79-9 at p. 2.

Around noon the next day, Nurse Smith learned that Mr. McDaniels' CPAP machine had not been transported to the SHU. Dkt. 79-7, para. 10. At 12:23 p.m. she sent another email instructing BOP staff to "PLEASE PICK UP [MR. MCDANIELS'] CPAP IN FCI PHARMACY AND BRING [IT] OVER TODAY."

---

[1] This fact is in dispute. Nurse Smith testified that Mr. McDaniels did not inform her that he needed refills for his self-carry medications. Dkt. 79-7 at para. 12. At summary judgment we accept Mr. McDaniels' version of events.

Dkt. 79-7, para 10 (all caps in original). Gregory Reeson, a pharmacist at FCC Terre Haute, replied that the CPAP machine was "already in the suitcase" and that he was "refilling [Mr. McDaniels'] [venlafaxine] because the pill pack only had 4 capsules in it." Dkt. 79-7, para. 11.

In the evening of August 4, 2017, Nurse Smith again administered an insulin injection to Mr. McDaniels in the SHU and provided him with his Effexor. Dkt. 79-9 at p. 2.

Medical staff in the SHU make rounds to dispense medications numerous times throughout the day. This results in a "continual flow" of medical personnel administering medications to inmates in the SHU. Dkt. 79-1, p. 31-32.

### E. Duress Alarm System in the SHU

Each cell in the SHU is equipped with an emergency duress alarm. Dkt. 79-15, para. 5. There is a button on the inside of each cell that, when pushed, activates the duress alarm. *Id.* When the duress button in the cell is pushed, it activates an alarm in the panel of the SHU "control bubble," the secure area where correctional officers monitor the inmates. *Id.* at para. 7. Once the alarm goes off, a correctional officer must walk down the range to the cell where the alarm button was pressed and reset the alarm. *Id.* at 8. To reset the alarm, the officer must use a key to activate a switch located immediately outside the cell door. *Id.* at para. 9. If a correctional officer does not reset a duress alarm in a timely manner, an additional alarm will go off in the Main Control room for USP Terre Haute. *Id.* at para. 8.

8

During the two days Mr. McDaniels spent in the SHU before his collapse, he pressed the duress button in his cell approximately 50 times. Dkt. 79-1, pp. 36-37. The purpose of these alarms was to notify prison officials that he had not received his cardiac medications and CPAP machine and to report his deteriorating condition. Dkt. 1, p. 5; dkt. 79-1, p. 38; dkt. 82-1, p. 5, paras. 25-30. The first couple times he pushed the duress button, an officer came to the door of his cell and asked, "What is your emergency? What is going on?" dkt. 79-1, pp. 37-38. After that, however, no one responded. *Id.* at 37.

On his second day in the SHU, Mr. McDaniels encountered a correctional officer and asked, "Why was nobody answering my [duress] button?" Dkt. 79-1, p. 36-37. The correctional officer answered, "Because I turned it off." *Id.* at 37.

The United States has presented evidence disputing Mr. McDaniels' assertion that correctional staff disabled the duress alarm in his cell. FCC Facilities Manager Blake Lott submitted an affidavit about his familiarity with the duress alarm system. According to Mr. Lott:

> SHU staff cannot disable the duress alarm switches or turn off the duress alarm system without causing damage to it. If such damage occurred, the Facilities Department would be notified of it. Records maintained by the Facilities Department from August 2017, do not indicate the receipt of any notification regarding damage to the duress alarm system in the SHU. I am not otherwise aware of any indication that the duress alarm system in the SHU was damaged or otherwise disabled during this time period.

Dkt. 79-15, paras. 10-12.

### F. Mr. McDaniels' Collapse and Emergency Hospitalization

On August 5, 2017, McDaniels again received insulin injections at approximately 7:25 a.m., 11:00 a.m., and 5:26 p.m. Dkt. 79-9, p. 2.

That evening, Mr. McDaniels experienced acute cardiac symptoms. *See* dkt. 1, pp. 4-5; dkt. 79-1, p. 117; dkt. 79-13; dkt. 79-17; dkt. 82-1, p. 5, paras. 27-30. He experienced significant physical pain and pressure in his chest, anxiety, and shortness of breath. *Id.* His heart rate was over 170 beats per minute, and he was having very uncomfortable heart palpitations. Dkt. 79-1, p. 45; dkt. 82-1, p. 5, para. 29. He repeatedly pushed the duress alarm button in his cell, but no one responded. Dkt. 1, p. 4; dkt. 79-1, pp. 35-38; dkt. 82-1, p. 5, para. 25. He vomited and collapsed on the floor of his cell and was not able to get up on his own. Dkt. 79-1, pp. 113-16; dkt. 79-13, p. 3; dkt. 82-1, p. 5, paras. 29, 30. As he laid on the floor of his cell, he worried he would "die in [his] SHU cell and [his] family would never know what had happened to [him]." Dkt. 82-1, p. 5 para. 1.

A nurse discovered Mr. McDaniels on the floor of his cell. Dkt. 1, p. 79-1, p. 113. To Mr. McDaniels, the nurse's voice "sounded like it was coming from a distance away." *Id.* The nurse helped him get up and took him to a medical examination room in the SHU. Dkt. 79-9, p. 114.

At 6:25 p.m., less than an hour after Mr. McDaniels received his evening insulin shot, Nurse Smith treated Mr. McDaniels in the medical examination room. Dkt. 79-13. His heart rhythm was irregular, and his EKG was abnormal. *Id.* at 2-3. Mr. McDaniels told Nurse Smith that he had not received his cardiac medications since his transfer to the SHU more than two days earlier. *Id.* at 3. Nurse Smith notified the on-call doctor and started Mr. McDaniels on an

intravenous saline drip. He was then transported to the emergency room at Union Hospital in Terre Haute. *Id.*

Shortly after Mr. McDaniels was taken to the hospital, Nurse Smith sent another email to the pharmacist asking them to "please send all of [Mr. McDaniels'] self carry" medications to the SHU. Dkt. 79-14. In that email, Nurse Smith stated that Mr. McDaniels "never told [SHU staff] that he didn't have self carry cardiac meds, and had to go out" to the hospital as a result. *Id.*

Dr. Imad Koj treated Mr. McDaniels at Union Hospital. Dkt. 79-17. Mr. McDaniels informed Dr. Koj that he had not received his cardiac medications for about three days. *Id.* at 1. Dr. Koj observed that Mr. McDaniels' heart rate was in the 130s and 140s and that he "was clearly in atrial fibrillation and high ventricular response rate." *Id.* His blood had coagulated to a subtherapeutic level. *Id.* 2. He was put on an intravenous diltiazem drip, and his other cardiac medications were also resumed. *Id.* After he was stabilized, an echocardiogram confirmed he was in atrial fibrillation. *Id.* at 1. Dr. Koj reported that Mr. McDaniels did not have a heart attack. *Id.*

Mr. McDaniels was discharged from Union Hospital on August 8, 2017. *Id.* at 4. At the time of his discharge, his heart rate was in the 70s, and Dr. Koj believed that he was doing well. *Id.* at 5. Regarding the treatment Mr. McDaniels received at Union Hospital, Dr. Koj reported, "Really [] we did not do much other than just resuming his medication." *Id.*

### G. Dr. Breall's Expert Report

Dr. Jeffrey Breall, M.D., Ph.D., is a cardiologist and clinical professor at the Indiana University Krannert Institute of Cardiology. Dkt. 79-20. He reviewed Mr. McDaniels' medical records and submitted an expert report with his conclusions about Mr. McDaniels' condition and care. *Id.*

Dr. Breall opines, "There was no evidence of a stroke and blood testing did not confirm any evidence of [a heart attack]. In my opinion, Mr. McDaniels was receiving reasonable and appropriate treatment at all times while under the supervision of the prison." *Id.* at 3. While Dr. Breall agrees that Mr. McDaniels suffered acute distress on August 5, 2017, he opines there was "no medium or long term sequalae as a result of these temporary deteriorations." *Id.* at 4. In addition, while patients such as Mr. McDaniels may experience atrial fibrillation and low INR (a measurement of blood clotting) regardless of whether they take their medications, these issues are more likely to occur if the patient is non-compliant with their medical therapy. *Id.* at 3-4.

### III.
### DISCUSSION

### A. Eighth Amendment Claims against Lt. Baker and Nurse Smith

Mr. McDaniels claims that Lt. Baker and Nurse Smith were deliberately indifferent to his serious medical need in violation of the Eighth Amendment when they failed to provide him with his cardiac medications after he was transferred to the SHU. A federal inmate may bring a *Bivens* action against federal officials under the Eighth Amendment for deliberate indifference to the

12

inmate's serious medical needs. *Carlson v. Green*, 446 U.S. 14, 24 (1980) (citing *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) (reaffirmed in *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017)).

### 1. Eighth Amendment Medical Standard

At all times relevant to his claims, Mr. McDaniels was a convicted offender. Accordingly, his medical treatment is evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

"To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotations omitted).

### 2. Objectively Serious Medical Condition

The defendants do not dispute that Mr. McDaniels had preexisting cardiac conditions, that he was did not receive medications for these conditions for multiple days, or that he collapsed in his cell, vomited, and had to be transported to a local hospital for emergency medical treatment. The arguments in their summary judgment briefs relate mostly to Lt. Baker's lack of personal involvement in his medical care and Nurse Smith's lack of deliberate indifference toward his medical conditions. *See id.* at 17-21.

A cardiac condition, including cardiac arrhythmia, chest pains, and hypertension, may constitute an objectively serious medical condition. *E.g.*, *Estelle v. Gamble*, 429 U.S. 97, 101 (1976); *Williams v. Liefer*, 491 F.3d 710, 715-16 (7th Cir. 2007). Considering the uncontradicted evidence regarding Mr. McDaniels' preexisting medical conditions, the lapse in his chronic cardiac medications for several days, and the acute distress he suffered on August 5, 2017, the Court concludes that he has presented evidence of an objectively serious medical condition.[2]

### 3. Deliberate Indifference

Prisoners bringing medical claims under the Eighth Amendment face a high bar. "While evidence of medical malpractice often forms the basis of a

---

[2] The defendants deny Mr. McDaniels' allegation that he suffered a heart attack on August 5, 2017. *See* Dkt. 80, p. 14. As explained in Part II of this Order, there is no medical evidence that Mr. McDaniels suffered a heart attack or stroke. Similarly, there is no medical evidence that the lapse in treatment caused any medium or permanent damage, such as a blood clot. The Court's conclusion that Mr. McDaniels suffered from an objectively serious harm is based only on his preexisting medical conditions and the acute distress he suffered following the lapse in his cardiac medications.

deliberate indifference claim, the Supreme Court has determined that plaintiffs must show more than mere evidence of malpractice to prove deliberate indifference." *Petties*, 836 F.3d at 728 (citing *Estelle*, 429 U.S. at 106). The plaintiff must show the defendant "did not just slip up, but was aware of, and disregarded, a substantial risk of harm." *Petties*, 836 F.3d at 728. Because officials seldom declare their intention to ignore a risk to an inmate's health, most plaintiffs will have to prove their case with circumstantial evidence. *Id.* One way to do this is to present evidence "of a prison official's decision to ignore a request for medical assistance." *Id.* A plaintiff does not need to show that he was literally ignored to prevail; it is enough that the risk of a particular course of treatment, or lack thereof, was obvious but ignored by the defendant. *Id.*

### i.   Lt. Baker

The fact that Lt. Baker is a non-medical prison official does not automatically shield him from liability. The Seventh Circuit has explained,

> "[I]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor."

*Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). However, "[n]on-medical defendants cannot simply ignore an inmate's plight." *Id.* If the plaintiff tells a non-medical defendant that he is receiving inadequate medical care and "the communication, in its content and manner of transmission, gave the prison

official sufficient notice to alert him or her to an excessive risk to inmate health or safety . . . the refusal or disinclination to exercise the authority of his or her office may reflect deliberate indifference." *Id.*

Here, the designated evidence does not support a reasonable inference that Lt. Baker was aware of and chose to ignore an excessive risk to Mr. McDaniels' health. Mr. McDaniels told Lt. Baker that he needed to get his medications before being transferred to the SHU. However, there is no evidence that Lt. Baker was aware of Mr. McDaniels' specific cardiac conditions or that he believed there was a significant risk that Mr. McDaniels would go into acute distress without these medications for a short time. To the contrary, the evidence is that Lt. Baker believed, correctly, that Mr. McDaniels would be seen by medical staff shortly after his arrival in the SHU. As such, he was "justified in believing that [Mr. McDaniels] [would be] in capable hands" upon his arrival. *Arnett*, 658 F.3d at 755.  *See also Zentmyer v. Kendall County, Ill.*, 220 F.3d 805 (7th Cir. 2000). Accordingly, the motion for summary judgment is **GRANTED** in favor of Lt. Baker.

### ii.   Nurse Smith

The parties dispute whether Nurse Smith was aware that Mr. McDaniels required but did not have self-carry cardiac medications before his collapse. According to Mr. McDaniels, he "asked her specifically about [his] heart medications" during their first patient visit. Dkt. 79-1, p. 29. However, Nurse Smith says that she did not know about his cardiac medications until after he

16

collapsed, at which point she immediately sent an email to the prison pharmacist directing him to send these medications to the SHU. Dkt. 79-7, paras. 12-14.

Courts look to "the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to a serious medical need." *Petties*, 836 F.3d at 728-29. Generally, an isolated lapse in otherwise consistent medical care, without more, is insufficient to establish deliberate indifference. *Gutierrez v. Peters*, 111 F.3d 1364 (7th Cir. 1997). But where there is a "markedly atypical" lapse in treatment that causes a serious deprivation in medical care, "mistreatment for a short time might . . . be evidence of a culpable state of mind . . . even where a plaintiff has previously received good care." *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999) (quoting *Dunnigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999)).

Construing the facts in the light most favorable to Mr. McDaniels, Nurse Smith knew that Mr. McDaniels "had been identified as having complex or chronic health conditions that require frequent clinical contacts to maintain stability and prevent medical complications." Dkt. 79-7, para. 5; dkt. 79-8. Mr. McDaniels told Nurse Smith that he had required but not have his self-carry cardiac medications. In response, she told him to stop whining. Thereafter, she made no effort to get Mr. McDaniels' cardiac medications until after Mr. McDaniels collapsed and was hospitalized.

On these facts, a reasonable jury could conclude that Nurse Smith was deliberately indifferent to Mr. McDaniels' serious medical need even though she provided Mr. McDaniels with care for his other conditions. *Reed*, 178 F.3d at

17

855. *See also Gil v. Reed*, 381 F.3d 649, 661-62 (7th Cir. 2004) (reversing summary judgment where a physician's assistant's "angry and unexplained refusal to provide an inmate with his prescribed [antibiotic]" after surgery caused serious complications; reasoning that the effort of filling the prescription was almost "zero" and the severity of the inmate's medical need was high).

Accordingly, the motion for summary judgment is **DENIED** as to Nurse Smith.

### B. FTCA Claim against the United States

For his claim under the Federal Tort Claims Act ("FTCA"), Mr. McDaniels alleges that correctional officers disabled the duress alarm in his cell before his collapse.

### 1. FTCA Standard

The FTCA is a limited waiver of the United States' sovereign immunity. The FTCA applies to federal inmates' claims alleging personal injuries sustained while incarcerated because of negligence of government employees. *See United States v. Muniz*, 374 U.S. 150 (1963). The FTCA authorizes suits against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable." 28 U.S.C. § 1346(b).

State tort law of the state where the tort occurred, in this case Indiana, applies when determining "whether the duty was breached and whether the

breach was the proximate cause of the plaintiff's injuries." *Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008).

Under Indiana law, to prove negligence, a plaintiff must establish by a preponderance of the evidence that the defendant: (1) owed a duty to the plaintiff; (2) breached that duty by failing to meet the appropriate standard of care; and (3) the plaintiff suffered injury as the proximate result of the defendant's failure to perform its duty. *See Parrott*, 536 F.3d at 635; *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016); *Estate of Mintz v. Connecticut Gen. Life Ins.*, 905 N.E.2d 994, 998-99 (Ind. 2009). "Summary judgment is appropriate in a negligence action where defendant demonstrates that the undisputed material facts negate at least one element of plaintiff's claim." *Halterman v. Adams County Bd. of Comm'rs*, 991 N.E.2d 987, 990 (Ind. Ct. App. 2013) (internal quotations omitted).

### 2. Duty of Care

The United States' duty of care owed to federal prisoners is established by 18 U.S.C. § 4042. *See United States v. Muniz*, 374 U.S. 150, 164-65 (1963). Pursuant to § 4042, the United States owes a duty to federal inmates to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2). While the United States was not required to provide access to a duress alarm as part of the duty of care, *see Jones v. United States*, No. 2:17-CV-00451-WTL-DLP, 2019 WL 2647593, at *7 (S.D. Ind. June 27, 2019), it did so here.

19

### 3. Breach

Mr. McDaniels alleges that the United States breached its duty of care when the duress alarm in his cell was rendered inoperable. He argues that he tried to use the duress alarm to call for medical assistance on August 5, 2017, and to request his CPAP machine and medications. In response, the United States argues that the duress alarm system was functioning such that there could be no breach.

Construing the facts in the light most favorable to Mr. McDaniels, a guard responded the first couple times Mr. McDaniels pushed the button on the duress alarm.  But thereafter, there was no response to his pushing the button numerous times.  Whether the duress alarm was intentionally deactivated or ignored, these are material facts in dispute regarding whether there was a breach of duty so summary judgment is not appropriate on this element.

### 4. Injury

Mr. McDaniels argues that he was injured by BOP officers' failure to respond when he attempted to use the duress alarm. The United States argues that Mr. McDaniels cannot show that any issues with the duress alarm led to his injuries.

This again is a material fact in dispute. The United States' medical expert opined that while patients such as Mr. McDaniels may experience atrial fibrillation and low INR regardless of whether they take their medications, these issues are more likely to occur if the patient is non-compliant with their medical therapy. Dkt. 79-20, pp. 3-4. In addition, Mr. McDaniels testified that he pressed

the duress alarm repeatedly before he collapsed, but no one responded. Consequently, he continued to suffer, experienced anxiety and collapsed on the floor. The hospital medical records indicate that after Mr. McDaniels received his medications he quickly stabilized. Given the evidence in the record, a reasonable factfinder could conclude that the delay in obtaining cardiac medications, attributable in part to the guards' failure to answer his duress alarms, unnecessarily prolonged and exacerbated Mr. McDaniels' pain. *See Williams v. Liefer*, 491 F.3d 710, 715–16 (7th Cir. 2007); *Gil*, 381 F.3d at 662 (recognizing that 'hours of needless suffering' can constitute harm).

The United States' motion for summary judgment on the FTCA claim is **DENIED**.

### IV.
### CONCLUSION

The defendants' motion for summary judgment, dkt. [79], is **GRANTED in favor of Lt. Baker and DENIED as to Nurse Smith and the United States.** The Court previously denied Mr. McDaniels' motions for assistance recruiting counsel. *See* dkts. 49, 52, 73. Given the complexities of late-stage litigation, such as a trial or settlement conference, the Court *sua sponte* reconsiders and **GRANTS** Mr. McDaniels' motions for assistance recruiting counsel. The Court will attempt to recruit pro bono counsel on Mr. McDaniels' behalf.

**SO ORDERED.**

Date: 9/30/2021

James Patrick Hanlon
United States District Judge
Southern District of Indiana


Distribution:

JOSEPH ANTHONY MCDANIELS
21298-086
1737 Belmont Avenue, Apt #2
Seattle, WA 98122

Jackson Taylor Kirklin
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
taylor.kirklin@usdoj.gov